UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NACA LOGISTICS (USA) INC., DCL HONG KONG LTD., d/b/a DIRECT CONTAINER LINE, and VANGUARD LOGISTICS SERVICES PTY, LTD., <br><br>            Plaintiffs, <br><br> v. <br><br> COSCO CONTAINER LINES COMPANY, LTD., and COSCO NORTH AMERICA, INC., SSA MARINE, INC., and SSA TERMINALS, LLC., <br><br>            Defendants. | No.  C04-1855Z <br><br> ORDER |

This matter comes before the Court on Defendants' motion for summary judgment, docket no. 21.  The Court, having considered the briefs in support and opposition to the motion, hereby GRANTS Defendants' motion for summary judgment on the issue of liability limitation.

## BACKGROUND

Plaintiffs NACA Logistics (USA) Inc., DCL Hong Kong Ltd., d/b/a Direct Container Line, and Vanguard Logistics Services Pty, Ltd. (collectively herein "NACA") filed this lawsuit seeking full indemnity for damages to a drill NACA contracted to ship from Ohio to China.  See First Amended Complaint, docket no. 5.  Defendant COSCO Container Lines

ORDER  -1-

1  Company, Ltd. is a foreign corporation which serves as an ocean carrier of cargo. Its North
2  American company, COSCO North America, Inc., is also a Defendant in this litigation.
3  Answer to Amended Complaint by Defendant COSCO North America, docket no. 12, at 1, ¶
4  5.
5       In early 2003, Colosseum Holdings Ltd. ("Colosseum"), an Australian company,
6  contracted to purchase a horizontal directional drill and its related equipment from American
7  Augers. Johnson Decl., docket no. 26, Ex. 1. Colosseum is associated with Cherrington
8  Asia Pacific Ltd. ("Cherrington"). Johnson Supp. Decl., docket no. 31, Ex. A, at 1.
9  Colosseum appears to have bought the drill on behalf of Cherrington for use in a
10  construction project in China. Johnson Decl., docket no. 26, Ex.1, Ex. 3 (Benoit Dep., at
11  0001-02).
12       As far back as 2002, Cherrington had contacted NACA about freight forwarding and
13  transportation services for the shipment of equipment. See id., Ex. 4 (Newman Dep., at Ex.
14  P-5). Comprised of an association of related shipping companies, NACA acts as a freight
15  forwarder and Non-Vessel Operating Common Carrier ("NVOCC"). It organizes and
16  coordinates complex, multi-modal shipments by hiring subcontractors, including trucking
17  companies, rail carriers, and ocean vessels. Id., Ex. 3 (Benoit Dep., at 9:16-13:1, 17:12-18).
18  Direct Container Line ("DCL") and Vanguard Logistics Services ("Vanguard"), acting on
19  behalf of NACA, planned the shipment of the drilling rig. Id., Ex. 4 (Newman Dep., at
20  16:12-17).
21       After Colosseum contracted to buy the directional drilling rig from American Augers,
22  NACA companies were assigned to arrange the shipment of the drilling rig from American
23  Auger's plant in Ohio to the construction project in China. Id., Ex. 3 (Benoit Dep., at 0001-
24  02). The purchase contract also required the buyer to insure the rig and its related equipment
25  for 110% of the selling price prior to shipment. Id., Ex. 1, at 5, at ¶ 6.
26

ORDER   -2-

Jeff Benoit, a Project Cargo Coordinator for NACA in San Francisco, arranged the transportation of the drilling rig from Ohio to a port where it would be booked on an ocean carrier for shipment to China. Id., Ex. 3 (Benoit Dep., at 18-26). Benoit then contacted a number of ocean carriers to obtain quotes for ocean shipment originating on the west coast. Id., Ex. 3 (Benoit Dep., at 24-43). Through its agent company COSCO North America, Inc., COSCO Container Lines provided the lowest quote for shipment from Los Angeles to Ningbo, China. Pursuant to COSCO's concerns about offloading the rig in Ningbo, Benoit agreed to have the rig shipped to Shanghai instead. Id., Ex. 3 (Benoit Dep., at 64:4-65:10). The trucking company set to bring the rig from Ohio informed Benoit that California Highway Department regulations might impede its transport in California. Id., Ex. 3 (Benoit Dep., at 67:17-68:20). Benoit then contacted COSCO and negotiated to have the drilling rig shipped from Terminal 18 in Seattle to Shanghai on the M/V JING POE HE at the original shipping rate. Id. The parties agreed to these modifications. Id.

DCL subsequently issued an intermodal bill of lading ("DCL Bill") covering the rig's entire transport from Ohio to China. Id., Ex. 3 (Benoit Dep., at Ex. 1), Ex. 4 (Newman Dep., at Ex. P-6).

Cherrington appears to have instructed Vanguard to list China Petroleum International Co. Ltd. as the consignee. Id., Ex. 3 (Benoit Dep., at Ex. 1). Under the DCL Bill, Cherrington and China Petroleum retained the status of "Merchant" and NACA, through DCL, held the status of "Carrier." See Plaintiffs' Response, docket no. 29-1, at § 1 ("DCL Bill").

Before shipping the drilling rig from Ohio, Benoit asked whether NACA should provide cargo insurance on the rig. Johnson Decl., docket no. 26, Ex. 3 (Benoit Dep., at 71:16-72:7, 0047). Benoit later learned that Cherrington had already insured the drilling rig and its related equipment, and thus NACA chose not to provide separate insurance. Id., Ex. 3 (Benoit Dep., at 75:19-23).

ORDER  -3-

The ocean shipment of the drilling rig and its equipment was negotiated pursuant to a "Service Contract" that NACA has with COSCO. Id., Ex. 4 (Newman Dep., at 22-38, Ex. P-7). NACA receives favorable rates based on the volume of shipments under these Service Contracts. Somma Affidavit, docket no. 24, at 1, ¶ 3. After COSCO and NACA reached their initial agreement, they amended the Service Contract to include the agreed upon rate of shipment for the rig from Seattle to Shanghai. Id. at 2, ¶ 4. COSCO subsequently issued a Proforma Sea Waybill which functioned as the bill of lading between NACA and COSCO ("COSCON Bill") for the ocean leg of the shipment only. McMahon Decl., docket no. 25, Ex. B; First Amended Complaint, docket no. 5, at 3, ¶ 7.

A bill of lading functions as a contract of carriage; it states the terms of shipment and records that a carrier has received goods from the party that wishes to ship them. Norfolk Southern Railway Co. v. Kirby, ___ U.S. ___, 125 S.Ct. 385, 390 (2004). Both the DCL and COSCON Bills provided a $500 per package liability limit to Defendants. DCL Bill, docket no. 29-1, at §§ 6, 19; McMahon Decl., docket no. 25, Ex. B, at § 10.

Benoit arranged for Schneider Transportation to pick up the drilling rig in Ohio. The drilling rig arrived at Terminal 18 on September 2, 2003. Fitzgerald Decl., docket no. 22, at Ex. 1. SSAT manages Terminal 18 for COSCO pursuant to Container Terminal/Stevedoring Agreement. Haney Affidavit, docket no. 23, at 2, ¶ 5. SSAT issued a "Dock Receipt" indicating that it had accepted the cargo on behalf of COSCO and that cargo was now subject to the COSCON Bill's terms. Fitzgerald Decl., docket no. 22, at 1, ¶ 3.

SSA Terminals longshoremen moved the drilling rig to the side of the M/V JING POE HE, a COSCO ocean vessel in early September 2003. Plaintiffs' Response, docket no. 29-2 (Newman Affidavit, at 3, ¶ 4). While the drilling machine was being hoisted by crane onto the vessel, it fell and was damaged as a result. Id. The drilling rig was never reloaded onto the vessel. Plaintiff NACA has retained control over the drilling rig ever since. Johnson Decl., docket no. 26, Ex. 4 (Newman Dep., at 38-39).

ORDER  -4-

NACA filed this lawsuit against COSCO Container Lines and COSCO North America (collectively "COSCO"). It amended its complaint to include SSA Marine, Inc. and SSA Terminals, Inc. (collectively "SSA") as additional defendants.[1] See First Amended Complaint, docket no. 5.

NACA now seeks full indemnity from Defendants in amounts exceeding $2.8 million. See First Amended Complaint, docket no. 5, at 4, ¶ 13. As of October 2003, American Augers quoted the owners of the drilling rig a cost of $499,135 for a complete new unit. Johnson Decl., docket no. 26, at Ex. 2. The issue on summary judgment is whether either of the two bills of lading governing the rig's transportation limit Defendants' liability to NACA to $500 per package shipped.

## DISCUSSION

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Once the moving party meets its initial responsibility, the burden shifts to the non-moving party to establish that a genuine issue as to any material fact exists. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party must present significant probative evidence tending to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991). Evidence submitted by a party opposing summary judgment is presumed valid, and all reasonable inferences that may be drawn from

---

[1] The Court shall hereafter refer to COSCO and SSA collectively as "Defendants."

ORDER   -5-

that evidence must be drawn in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Pursuant to Fed. R. Civ. P. 56, Defendants move for summary judgment arguing they are entitled as a matter of law to liability limitations.[2] See Defendants' Motion for Summary Judgment, docket no. 21, at 1. Defendants argue the terms of the COSCON Bill expressly preclude liability beyond the stated limit of $500 per package. See id. at 13.

NACA opposes summary judgment based on the language of the DCL Bill. See Plaintiffs' Response, docket no. 29, at 4-5. NACA claims the potential exists for Defendants to obtain greater or further exemptions from liability depending on the outcome of the parallel litigation in Australia.[3] NACA's speculation as to the results of parallel litigation and its prospective effect on the current dispute fails to create a genuine issue of material fact capable of defeating a motion for summary judgment. See Matsushita, 475 U.S. at 586-87. By arguing that summary judgment elevates Defendants to the level of preemptive super beneficiaries, NACA puts forth a legal argument, not a factual one. The status, rights, and obligations of Defendants arise from the contractual language of the bills of lading. Consequently, the applicability of the bills' liability limitations is fundamentally a question of law suitable for summary judgment. See United States v. King Features Entm't, Inc., 843 F.2d 394, 398 (9th Cir. 1988) (interpretation of a contract is a matter of law properly decided on summary judgment).

Before turning to the merits of the parties' arguments, it is helpful to examine how the

---

[2] In addition to the terms of the bills of lading, Defendants rely on two cases in their briefing: Norfolk Southern Railway Co. v. Kirby, ___ U.S. ___, 125 S.Ct. 385, 390 (2004) and Kukje Hwajae Insurance Co., LTD. v. The "M/V Hyundai Liberty," et al., 408 F.3d 1250 (9th Cir. 2005). In Kukje the central issues involved a forum-selection clause and the "fair opportunity requirement." Since neither of those issues is raised by the parties here, the Court declines to rely on Kukje in this Order.

[3] The owners of the drill initiated litigation against NACA in April 2004 seeking damages incurred when the drilling rig fell on the dock at Terminal 18. Plaintiffs' Response, docket no. 29, at 2.

ORDER -6-

1  commercial shipping industry manages risk.  Sophisticated commercial shipping parties

2  accept below-market liability limits in order to obtain lower shipping rates.  See Michael F.

3  Sturley, The Future of Maritime Law in the Federal Courts: A Faculty Colloquium, 31 J.

4  Mar. L & Com. 241, 244 (2000).  As is common in the shipping industry, Cherrington

5  allocated its risk by insuring the cargo independently.  Johnson Decl., docket no. 26, Ex. 3

6  (Benoit Dep., at 0047); Sturley, supra, at 244.  In doing so, it was presumably paying less

7  than it would have had it declared a higher value on the DCL Bill.  See Norfolk, 125 S.Ct. at

8  390.  The DCL Bill, which acted as the contract of carriage between the owners of the

9  drilling rig and NACA, reflected this practice.  A significant gap existed in the DCL Bill

10 between the value of the drilling rig and the $500 liability limit granted to NACA.  See First

11 Amended Complaint, docket no. 5, at 4, ¶ 13.  This calculated divergence enabled the owners

12 to receive lower shipping rates, while shifting risk away from carriers who did not receive

13 insurance premiums to cargo underwriters who did.  See Sturley, supra, at 244.

14        Relationships between NVOCCs and ocean carriers also mirror this industry custom.

15 Subcontractor shippers such as COSCO typically receive an identical $500 liability limit

16 from the NVOCC with whom it contracts in exchange for reduced shipping rates.  The

17 subcontractors in this case, Defendants COSCO and SSA, obtained liability limitations from

18 both NACA and the original owners in the two bills of lading.  The DCL Bill extended the

19 $500 liability limitation through a Himalaya Clause while the COSCON Bill provided it by

20 adopting the default liability in the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §

21 1300 et seq.  See DCL Bill, docket no. 29-1, at §§ 6, 19; McMahon Decl., docket no. 25, Ex.

22 B, at § 10.

23        The COSCON Bill resolves the present dispute in favor of Defendants as a matter of

24 law.  Contracts for carriage of goods by sea "must be construed like any other contracts: by

25 their terms and consistent with the intent of the parties."  Norfolk, 125 S.Ct. at 397.

26        The COSCON Bill operated as the service contract between NACA and COSCO.

First Amended Complaint, docket no. 5, at Ex. 1.  SSA remained a beneficiary under the COSCON Bill because COSCO subcontracted work to it.  See Haney Affidavit, docket no. 23, at 2, ¶ 5; McMahon Decl., docket no. 25, Ex. C, at cl. 7(2).  The contract's default liability amount stems from COSCO's Tariff ("Tariff"), parts of which are expressly incorporated by the COSCON Bill in Section 10.  See McMahon Decl., docket no. 25, Ex. B, at § 10.  Clause 7(2) of the Tariff subjects the cargo listed in Section 10 of the COSCON Bill to provisions of COGSA because the shipment originated in the United States.  The clause provides:

> "[N]either the Carriers nor its servants, agents, Sub-contractors and/or the Vessel shall in any event be liable for any loss of or damage to the Goods in an amount exceeding the limits per package or unit prescribed by US COGSA, unless the nature and value of the Goods have been declared by the Merchant before shipment and inserted in this Bill of Lading and the Merchant has paid additional Freight on such declared value."

Id., Ex. C, at cl. 7(2).  The record demonstrates that NACA failed to declare a higher value to COSCO at the time the COSCON Bill was issued.  See COSCO Waybill, docket no. 6, at § 10.

Defendants are entitled to the liability limitation of $500 per package absent a declaration of higher cargo value.  McMahon Decl., docket no. 25, Ex. C, at cls. 7(2), 26(2).  The COSCON Bill provided a space for NACA to declare a higher cargo value which it left blank.  See COSCO Waybill, docket no. 6, at § 10.  Neither party contests COSCO's status as "Carrier," nor SSA's status as "Sub-contractor," under the Tariff.  Under COGSA, and the Tariff by implication, liability cannot exceed "$500 per package lawful money of the United States." 46 U.S.C. § 1304(5).  Given the contract language's plain meaning and the sophistication of both parties, no reason exists to contravene the clause's obvious adoption of COGSA's default liability limitations.  See Norfolk, 125 S.Ct. at 397.  COSCO and SSA are therefore entitled to limit their liability to NACA in the amount of $500 per package shipped.

ORDER  -8-

The Tariff contains other provisions which further support the application of the liability limitation. Because the Proforma Sea Waybill functioned as the contract, NACA accepted "all said terms and conditions, including . . . the per package and other limitations of liability contained" in the Tariff. McMahon Decl., docket no. 25, Ex. C, at § 30. By including SSA in its claim, NACA has violated the contract provision precluding it from bringing any claim or legal action against any of COSCO's subcontractors. See id. at §§ 1, 3.

Had NACA desired a higher level of liability from COSCO it could have asked for it. See Travelers Indem. Co. v. Vessel Sam Houston, 26 F.3d 895, 899 (9th Cir. 1994). NACA is a sophisticated shipper. It negotiated the shipping rate for the drilling rig pursuant to the Service Contract it already had in place with COSCO. Somma Affidavit, docket no. 24, at 1, ¶ 3. Given its pre-existing relationship with COSCO, NACA was familiar with COSCO's shipping procedures, Tariff, and bill of lading. Although NACA knew it could opt out of the Tariff's COGSA limitations, it declined to do so. NACA even concedes that "the terms of properly negotiated bills of lading and service contracts should be enforced to maintain commercial fairness and predictability within international trade." Plaintiffs' Response, docket no. 20, at 4.

NACA relies solely on the DCL Bill in its opposition to Defendants' Motion. Plaintiffs' Opposition, docket no. 29, at 5. It contends that granting the written liability limitation entitles Defendants to "greater or further exemptions" contrary to the terms of the DCL Bill.[4] Id. NACA also seeks a stay of this action until the first litigation it filed in Australia concludes. Id.

NACA's arguments fail to establish how granting the $500 limit violates the plain

---

[4]Section 6 of the DCL Bill provides, in part, that the beneficiaries of the Himalaya Clause, including COSCO and SSA, "are not entitled to any greater or further exemptions, limitations of or exonerations from liability than those that the Carrier [DCL and NACA] has under *this* Bill of Lading in any given situation." DCL Bill, docket no. 29-1, at § 6(b) (emphasis added).

ORDER -9-

language of the DCL Bill. Defendants do not seek any greater or further exemptions from the liability limitation provided to NACA under the DCL Bill.[5] What they do seek is the same limit afforded to NACA under the DCL Bill - one they are entitled to according to the terms of the DCL Bill. See DCL Bill, docket no. 29-1, at §§ 6, 19. Himalaya Clauses, such as the one in Section 6 in the DCL Bill, warrant no special treatment. Norfolk, 125 S.Ct. at 397. The plain language of the DCL Bill provides an expansive liability limitation to all participating carriers and stevedores, including all persons providing any subcontracting services. DCL Bill, docket no. 29-1, at § 19. Since the owners of the drilling rig never declared a higher cargo value, the Himalaya Clause of the DCL Bill extends to Defendants the same $500 liability limitation afforded to NACA should the owners of the drilling rig seek greater liability.[6] Id. Thus, NACA's only argument opposing summary judgment must fail: Defendants do not seek any greater or further exemption than the $500 per package limit guaranteed to NACA under the DCL Bill.

## CONCLUSION

---

[5]The DCL Bill's Himalaya Clause extends NACA's liability limitation of $500 per package to all downstream subcontractors hired for carriage. See DCL Bill, docket no. 29-1, at § 6. It reads in pertinent part:

> "all exemptions, limitations of and exonerations from liability provided by law or by the Terms and Conditions hereof shall be available to all agents, servants, . . . all Participating . . . carriers and all stevedores, terminal operators . . . inclusive of all persons providing any service whatsoever."

Id. In the present dispute, the Himalaya Clause significantly limits the amount owners of the drilling rig can recover from NACA and its subcontracting parties. This liability limitation in the DCL Bill, while valid and enforceable, protects Defendants from owing greater liability to the owners of the drilling rig.

[6]Section 19 of the DCL Bill reads in part: "The Carrier's [NACA's] liability, if any, shall be determined on the basis of a value of $500 per package or per shipping unit or pro rata in case of partial loss or damage, unless the nature of the cargo and valuation higher than $500 per package . . . shall have been declared by the Merchant [Cherrington] before shipment." DCL Bill, docket no. 29-1, at § 19. Section 6(b) extends this limit to all subcontractors of NACA, including COSCO and SSA in this case. Id. at § 6(b).

ORDER  -10-

The plain language of the COSCON Bill is dispositive to the legal question presented. Its very terms indicate that COSCO and SSA were intended beneficiaries of the COSCON Bill's liability limitation of $500 per package shipped. Thus, the Court holds the liability limitations in the COSCON Bill apply. Each Defendant is therefore entitled to limit their liability to $500 per package. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment, and Defendants are entitled to the liability limitation contained in the COSCON Bill.

IT IS SO ORDERED.

DATED this 6th day of September, 2005.

_____
Thomas S. Zilly
United States District Judge